Case 1:18-cv-01442-HYJ-SJB   ECF No. 1, PageID.1   Filed 12/27/18   Page 1 of 10

FILED - GR
December 27, 2018 12:38 PM
CLERK OF COURT
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
BY:_ns__ SCANNED BY: kw / 12/27

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

MARIE WOHADLO, Plaintiff

v.

TENTCRAFT INC., MATT BULLOCH,
ZACH GRICE, ROB HANEL,
JOSH SCOTT, Defendants.

Case No. _____

Jury Trial Demand

**1:18-cv-1442**
**Janet T. Neff**
**U.S. District Judge**

## CIVIL COMPLAINT

1. Now comes pro se Plaintiff, MARIE WOHADLO (hereinafter, "Plaintiff") and complains against TENTCRAFT INC., MATT BULLOCH, ZACH GRICE, ROB HANEL, and JOSH SCOTT, Defendants.

### NATURE OF THE ACTION

2. This is a federal question and civil rights action alleging employment discrimination, sexual harassment, hostile work environment, disparate treatment, and retaliatory conduct pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e; the Civil Rights Act of 1991, 42 U.S.C. §1981; and the State of Michigan Elliott-Larsen Civil Rights Act of 1976 "ELCRA", MCL 37.2101.

3. Plaintiff signed a complaint with the EEOC, stating: "I believe I have been subjected to sexual harassment due to my sex, female, and discharged in retaliation for not having tolerated the sexual harassment I was subjected to, in violation of Title VII of the Civil Rights Act of 1964, as amended." and "On or about 15 May 2018, I was subjected to sexual harassment by a co-worker in front of a Supervisor. The Supervisor did nothing to correct the behavior. On 16 May 2018, the same Supervisor came to me and asked how I felt about the co-worker who had harassed me. I was noncommittal and obviously upset with the situation. Later that same day my employment was terminated. I did send a complaint to Human Resources complaining about the harm I had experienced, to no avail."

4. All administrative remedies have been exhausted with the EEOC and this complaint is filed pursuant to a "Right to Sue" letter issued on September 25, 2018 and received by Plaintiff on October 1, 2018, allowing Plaintiff to file a lawsuit within ninety days, which she did.

### JURISDICTION AND VENUE

5. Federal jurisdiction is appropriate in this instance to secure protection and to redress deprivation of rights conferred by Title VII of the Civil Rights Act of 1964 and the Civil Rights Act of 1991 as well as the State of Michigan Elliott-Larsen Civil Rights Act of 1976.

6. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2), in that the events giving rise to the claims in the present lawsuit arose in this district, with supplemental jurisdiction of the State of Michigan.

## PARTIES

7  Plaintiff, Marie Wohadlo, is a resident of Benzie County, Michigan and worked for Defendant Tentcraft as a "Digital Print Operator" from May 7, 2018 until terminated on May 16, 2019.

8  Plaintiff is under a protected class based on her sex.

9  Defendant TENTCRAFT INC is a registered corporation with its principal place of business located at 2662 Cass Rd., Traverse City (Grand Traverse County) Michigan. Tentcraft is engaged in an industry affecting commerce and employs more than 15 people for each working day in each of 20 or more calendar weeks on the current or preceding calendar year.

10  Defendant MATT BULLOCH, a male owner-operator of Tentcraft, at all relevant times was "President and CEO" of Tentcraft, located at 2662 Cass Rd., Traverse City, MI 49684, where Plaintiff worked. Defendant Bulloch is listed online with LARA and the State of Michigan as his own Registered Agent, President, Vice President, Secretary and Treasurer at the same address.

11  Defendant ZACH GRICE, a male employee of Tentcraft, at all relevant times was "Print Value Stream Supervisor" in the Print department at Tentcraft where Plaintiff was also employed.

12  Defendant ROB HANEL, a male employee of Tentcraft, at all relevant times was "People Manager "at Tentcraft where Plaintiff was also employed.

13  Defendant JOSH SCOTT, a male employee of Tentcraft, at all relevant times was "Digital Print Operator" in the Print department at Tentcraft where Plaintiff was also employed.

14  To the best of the Plaintiff's knowledge, all Defendants are still employed at Tentcraft as of the date of the filing of this complaint.

## BACKGROUND

15  On April 23, 2018, Plaintiff was interviewed by Zach Grice at Defendant's place of work. Grice told her that the position for which she is being interviewed is in the Print department on the second shift which he called "super important, touches every job" working alongside Defendant Josh Scott for whom Grice had high praise. Plaintiff briefly wrote on her notepad, "2nd shift —> next day flow, "2 amazing people", Josh Navy".

16  Following the interview with Zach Grice, Rob Hanel requested a recap, and for the second time, Plaintiff was made aware of Josh Scott's military experience. Plaintiff thought it was odd, but not a reason to change the course of the job application process already set in motion.

17  On April 30, 2018, Plaintiff was offered a full-time position with benefits as "Digital Print Operator" at Tentcraft with a start date of May 7, 2018 at 8:30 am. Plaintiff accepted.

18   Plaintiff was told by Grice that she would be trained during the day shift before eventually working the second shift with Defendant Josh Scott. During her short employment period at Tentcraft, Plaintiff's daytime training schedule overlapped with Scott's work schedule for only a couple hours per day (at most) and in the presence of other coworkers.

19   All Digital Print Operators report directly to Zach Grice, who was Plaintiff's supervisor with the power and duty to control Plaintiff's work schedule, tasks, projects, training, and the department workplace environment, among other powers and duties.

20   On May 7, 2018, Plaintiff was promised delivery of copies of company documents from Rob Hanel by Jennifer Anderson; but the papers were never sent to or received by Plaintiff.

21   Plaintiff was proactive and eager to fulfill her new job requirements, acquire training, learn about company products, other departments, other employees, social events, the health and wellness reimbursement program, and other aspects of company culture.

22   Plaintiff asked questions; sought information; particpated in all required and requested events and meetings. She identified Print department workplace problems and hazards as part of the extensive Tentcraft "Make It Better" program which entailed companywide incentives and requirements for all employees to "save two seconds".

23   On or about May 9, 2018, the Defendant and company owner-president Matt Bulloch gathered all on-duty employees onto a central outdoor patio for a new product launch announcement. During his speech about company projects, Bulloch told everyone how Tentcraft will be developing policies and procedures to deal with sexual harrassment with a final comment that he hopes he will "never have to deal with that". In hindsight, the comment was ominous.

## HOSTILE WORK ENVIRONMENT

24   All Print department coworkers of Plaintiff were male and full-time. Her sole female coworker, Mariah W. (surname unknown), was summer-only with a temporary or seasonal status. Mariah rarely, if ever, spoke to Plaintiff unless Plaintiff approached her first. To a lesser degree, the same could be said of Plaintiff's male coworkers in the department who gave her "the cold shoulder".

25   Resistance to Plaintiff's workplace particpation and on-the-job training began as petty things like not being allowed by coworker Shawn Kellogg to keep colored markers in a pencil cup on the shared workstation desk.

26   Resistance to Plaintiff's workplace particpation and on-the-job training frequently left her to sit idle and merely watch coworkers carry on their daily tasks, most of which are repetitive in nature.

27   Whenever Supervisor Zach Grice was available, Plaintiff would ask for more information and more interaction. She complained to Grice that her coworkers had been giving her very little training. Grice said it was same experience when he was hired yet he did little-to-nothing to change the situation.

28. On May 12, 2018, Plaintiff texted Grice— *"Still need some tips on how to engage Shawn [Kellogg]. TCraft is paying me to do virtually nothing."*

29. On May 13, 2018 and at other times, Defendant Shawn Kellogg would recline in his chair with his legs spread and his hands behind his head, positioning his hips uncomfortably close to Plaintiff's head and face. Plaintiff didn't say anything because it was anxiety-producing and she knew she would eventually not work alongside him. Plaintiff hoped the problem would just go away.

30. On May 14, 2018, after Plaintiff again pursued the matter of job training with Grice. He finally relented and emailed Plaintiff a manual for one of the large format digital printers which she was specifically hired to operate (among other duties). She began reading parts of it to fill time and try to begin to be useful to the company.

## SEXUAL HARASSMENT

31. On May 15, 2018, at or around 5pm, Plaintiff was subjected to severe and unwelcome discriminatory sexual harassment by Defendant-coworker Josh Scott.

32. Plaintiff was seated closely and directly to the left of Defendant Josh Scott at a computer workstation, an L-shaped desk. Supervisor Grice was standing a couple feet away to the left of Plaintiff. It was relatively quiet that day (for a room full of big noisy machines). Josh does not talk much, but he blurted out of the blue, "hey, nice rack!" while grinning and facing Plaintiff and Grice who glanced knowingly at Scott.

33. A "rack" is widely known in American culture as derrogatory slang referring to a woman's breasts, which makes "hey nice rack" an expression of the sexual attractiveness of a woman's reproductive organs.

34. Plaintiff was stunned, shocked and in a state of disbelief. She was offended, disgusted, and repulsed at Scott's behavior which clearly objectified and demeaned her.

35. Fortunately, it was near the end of the work day and Plaintiff was able to leave punch out for the day and leave the building approximately one half hour later, thereby minimizing further interaction that day with Defendant Scott.

36. Plaintiff was never given any method to use to report or otherwise remedy the sexual harassment problem. She was confused and did not know what to do, especially since Defendant-supervisor Zach Grice witnessed the harassment and did nothing about it.

## INTIMIDATION, DISPARATE TREATMENT

37. On the morning of May 16, 2018, during the department "huddle", lifting objects was discussed and coworker Eli McNaugton bent over while talking about moving objects. Plaintiff added that she had OSHA training, and that you should never bend over to pick up an object but bend your knees and lift with your legs, for which she crouched down to illustrate the maneuver.

38     Later in that same morning, coworker McNaughton asked Plaintiff if she was "intimidated by the machines". The previous week, coworker Shawn Kellogg had asked Plaintiff the exact same thing. Her answers were "if I was, they wouldn't have hired me" and "no", respectively.

39     McNaughton told Plaintiff that she must move a 300-pound 15-foot roll of fabric by herself "exactly as instructed" or she "could be fired". Plaintiff failed in the manner specified because there was no mechanical advantage and only two narrow black straps to lift the roll onto a wheeled cart. McNaughton emphasized again that it had to be done precisely as instructed or be fired. Plaintiff later reiterated her safety concern to Grice who said that would be "something for down time".

40     McNaughton also told paintiff that ex-employee Ryan Farrier was fired because he hurt his wrist in this same maneuver with the big heavy roll of fabric.

41     Coworker Kellogg had previously told Plaintiff that her predecessor Ryan Farrier "is no longer employed here". Grice told Plaintiff that Farrier "hurt his wrist". McNaughton told Plaintiff that Farrier was hurt moving the same 300-pound roll of fabric which he demanded Plaintiff manuever under penalty of termination.

42     In addition to safety concerns for her own well-being, Plaintiff had good faith reasons to oppose what she believed was unjust and possibly unlawful retaliatory treatment of Farrier, based upon conversations with Defendant-coworkers.

43     Later that same morning, Plaintiff walked around observing and examining department equipment and its output, lacking any other tasks or instructions. McNaughton suddenly screamed at Plaintiff, "what are you doing!" while running toward her. Plaintiff was standing still at a computer workstation for one of the large format printers, examining the screen display, as was common for any Print department employee. Plaintiff was surprised and dumbfounded.

44     McNaughton grew hostile and aggressive, yelling at Plaintiff, "you could do millions in damage!" He also claimed Plaintiff had been "asking questions about former employees", as if to suggest something nefarious. He said, "do you want to go talk to someone about this" and Plaintiff calmly said, "I am talking to you", which was Plaintiff's attempt to de-escalated the situation. McNaughton left and Plaintiff saw no one else in the room and so she went to lunch at 12:02pm.

45     Plaintiff soon texted Defendant-supervisor Grice to see if he was available to speak with her about the encounter with McNaughton. Grice indicated "not at the moment" and that he would "be down shortly". In retrospect, Plaintiff realized "down" meant Grice was likely upstairs in the office of Defendant and "People Manager" Rob Hanel.

46     At or around 12:45 pm, supervisor Grice ushered Plaintiff into the "Cranium" meeting room and closed the door. He seemed agitated and mentioned at least twice that he has a meeting at 1:30pm, often looking at the time. In retrospect, that "meeting" was to entail employment termination of Plaintiff.

47. Grice was the male supervisor and agent of Defendant Tentcraft who witnessed the sexual harassment of Plaintiff by Josh Scott less than twenty-four hours prior, and Plaintiff was now alone with him and unable to leave.

48. Grice did not address Plaintiff's current problematic encounter with McNaughton as requested by her, but instead retold Plaintiff of Josh Scott's "military experience" and asked her how she "felt" about him. Grice was complicit as a vicarious harasser so Plaintiff felt threatened and was non-commital.

49. Plaintiff was intimidated, shaking, and her eyes welled up, as she tried to hold back tears.

50. Shortly thereafter, Grice approached Plaintiff and said "Rob wants to talk to us".

## RETALIATION, TERMINATION

51. In Rob Hanel's office, Plaintiff was interrogated as Grice sat quiet. Hanel was leaning toward Plaintiff from behind his desk with his eyes wide open and a stern face staring at her in an angry and intimidating manner.

52. Hanel accused Plaintiff of touching the shoulder of Eli McNaughton with her hand. He also accused her of "shaking him" and called it "unacceptable". Plaintiff admitted touching McNaughton's shoulder but flatly denied shaking him.

53. Hanel said, "do we have a strict no touch policy? . . . no", answering his own question in the same breath.

54. Hanel also said to Plaintiff, "we don't talk about other employees" and as the tension in the room intensified.

55. Plaintiff asked if she was being fired. Hanel affirmed. Plaintiff was escorted out of the workplace by Hanel and Grice.

56. At 1:58 PM on May 16, 2018, when Plaintiff arrived home, she emailed Defendant Rob Hanel and employee Jennifer Anderson about the sexual harrassment which she experienced the previous afternoon.

57. No one from Tentcraft, nor its representatives, ever responded to the Plaintiff in any capacity or communication method about her sexual harassment complaint.

58. Zach Grice is a member of Tentcraft management with substantial authority and discretion to make decisions concerning the terms of employment of all Print department employees; their workplace conditions; a duty to communicate to management complaints about work conditions; and other powers and duties.

59. Grice witnessed sexual harassment of the Plaintiff; failed to take prompt, effective remedial action reasonably calculated to end the harassment of the Plaintiff. Subsequent interactions with Grice about her interactions with harasser Josh Scott were intimidating and anxiety-ridden as Grice was a transgressor and a vicarious harasser.

60. Grice immediately transmitted a grievance of a male coworker, Eli McNaughton, to "People Manager" Rob Hanel while largely ignoring or avoiding workplace complaints by the Plaintiff.
61. Grice participated in intimidating the Plaintiff before just a half hour before enabling and witnessing her termination by Hanel.
62. Grice failed to discourage other potential harassers from engaging in similar unlawful conduct by allowing or enabling the harassment of the Plaintiff by Scott.
63. Defendants had in place no policies or procedures governing sexual harassment or discrimination. Plaintiff had no available preventative or corrective opportunities, and at not time and in no manner was Plaintiff ever informed of a process, policy, method or venue for reporting sexual harassment.
64. Plaintiff believes Defendants intentionally decided to preemptively terminate Plaintiff for pretextual reasons rather than investigate and remedy the sexual harassment (sexually hostile work environment).
65. Plaintiff believes Defendants intentionally decided to shield their sole second shift employee, Josh Scott, from a report and investigation of sexual harassment, and any possible consequences thereof by preemptively retaliating against the Plaintiff.
66. Grice disparately favored male subordinate concerns from McNaughton over the Plaintiff's without investigating her concerns while taking McNaughton's accusations directly to his superiors.

## COUNT I
### DISCRIMINATION BASED ON SEX (US Civil Rights Act of 1964; 42 USC 2000e-2)

67. Plaintiff incorporates and includes Paragraphs 1-66 as paragraph 67 of the complaint.
68. Plaintiff asserts she was discriminated and retaliated against because of her sex, a protected class under federal and state civil rights.
69. "Hey nice rack!" is a shocking and altogether inappropriate misogynistic epithet used as an expression of the sexual attractiveness of Plaintiff's reproductive organs, namely, her breasts. It was — and will always be — unwelcome and unprompted by the Plaintiff.
70. "Hey nice rack!" would be entirely unwelcome by any reasonable woman, especially in the workplace, where verbally objectifying a coworker severely undermines the existence or even pretense to workplace equality and teamwork.
71. "Hey nice rack!" is direct discriminatory action by Defendant-coworker Scott as witnessed, allowed via inaction, and vicariously perpetrated by Defendant-supervisor Zach Grice.
72. Sexual harassment of Plaintiff by Defendants severely altered the terms of Plaintiff's employment because she was explicitly hired to work alongside Defendant-harasser Josh Scott, alone with him at night on second shift in the Print department, without a supervisor, where all doors to the hallway and other departments are closed because of dust and noise.

73. Disparate treatment on the basis of sex was used against the Plaintiff by Defendants in preemptive retaliatory termination of Plaintiff on May 16, 2018, less than twenty-four hours after sexual harassment by Josh Scott and vicariously harassed by Zach Grice. Grice not only failed to do anything about the harassment, he acquiesced to the it, intimidated the Plaintiff in private, and conspired to have her fired to prevent an investigation of: the harassment; of himself, his behavior and his involvement; and any potential consequences for Josh Scott.

## COUNT II
### RETALIATION (US Civil Rights Act of 1964; 42 USC 2000e-3)

74. Plaintiff incorporates and includes Paragraphs 1-73 as paragraph 74 of the complaint.
75. Defendants terminated Plaintiff for reasons as stated by Defendant Rob Hanel: (1) touching the shoulder of coworker Eli McNaughton, which Defendant Rob Hanel called "unacceptable" and (2) "talking about other employees".
76. Defendant, via its managing agents, has engaged in intentional preemptive retaliation against the Plaintiff in anticipation of Plaintiff engaging in protected opposition to disparate treatment and a sexually hostile work environment, and has done so with malice or reckless indifference to the rights of the Plaintiff.
77. If touching the shoulder of coworker Eli McNaughton was a true reason for terminating the Plaintiff, then Defendant would be expected to produce documentation of a "no touch" policy, but they cannot. Defendant Rob Hanel admitted to Plaintiff on May 16, 2018, Tentcraft has no such policy.
78. If touching the shoulder of coworker Eli McNaughton was a true reason for terminating the Plaintiff, then Defendant might also be expected to show evidence of other employees fired for putting a hand on a coworkers shoulder.
79. Both of the above two propositions fly in the face of logic and common sense.
80. Plaintiff asserts that touching the shoulder of coworker Eli McNaughton was proffered as one of two pretextual reasons for the adverse action of preemptively terminating Plaintiff in a desperate and retaliatory attempt to snuff out and avoid dealing with the known issue of sexual harassment of the Plaintiff by Defendant Josh Scott which occurred the previous day.
81. If "we don't talk about other employees" was a true reason for terminating the Plaintiff, then Defendant should be expected to produce lawful reasons and distributed company policies covering an alleged 'no talking about other employees' rule. Defendant should also show evidence where other employees were also fired for "talking about other employees".

82   Both of the above two propositions fly in the face of common sense as well as the fact that Tentcraft 'talks about employees' to the entire world via their website displaying names, photographs, and personality traits about all its employees. What's more, Plaintiff's supervisor Grice told other employees facts about Plaintiff's life before she even arrived on the job, as evidenced by coworkers in other departments inquiring about facts about her life which she had only shared with Grice.

83   If "we don't talk about other employees" was a false and pretextual reason for terminating the Plaintiff, then this is (1) discrimination and retaliation via disparent treatment of Plaintiff by Defendants and their attempt to suppress Plaintiff's right to oppose what she truly suspected was an unlawful retaliatory act of termination upon a former employee, Ryan Farrier, by Defendant Tentcraft (and other unknown actors). Plaintiff based her suspicion upon conversations with her Tentcraft Print department coworkers; also based upon her direct observation that Ryan Farrier was not then employed by Defendant Tentcraft.

84   If "we don't talk about other employees" was a false and pretextual reason for terminating the Plaintiff, then this is a retaliatory adverse action against the Plaintiff in their plan to avoid dealing with the serious matter of a sexual discrimination (harassment) and a hostile workplace environment created by Josh Scott; and as witnessed by transgressor Zach Grice, signalling to other employees that it is okay to sexually harass coworkers.

## COUNT III
## DISCRIMINATION BASED ON SEX (Elliott-Larsen Civil Rights Act MCL 37.2101 et seq.)

85   Plaintiff incorporates and includes Paragraphs 1-84 as paragraph 85 of the complaint.

## COUNT IV
## RETALIATION (Elliott-Larsen Civil Rights Act MCL 37.2101 et seq.)

86   Plaintiff incorporates and includes Paragraphs 1-85 as paragraph 86 of the complaint.

## COUNT V
## INFLICATION OF EMOTIONAL DISTRESS

87   Plaintiff incorporates and includes Paragraphs 1-86 as paragraph 87 of the complaint.

## RELIEF

88   For actions taken against her "with malice or with reckless indifference to the federally protected rights of an aggrieved individual, the Plaintiff asks this court to enter the following judgment for relief:
   a. Back
   b. Front pay.
   c. Value of benefits.
   d. Compensatory damages for emotional distress, pain & suffering, mental anguish and loss of enjoyment of life.
   e. Attorney(s) fees if Plaintiff is subsequently acquires an attorney(s).
   f. Punitive damages.

g. A judgment in excess of $100,000.

h. An additional sum to cover taxes after a monetary award.

i. Injunctive relief.

j. Nullification of the adverse employment actions taken by Defendants against Plaintiff.

k. Other relief deemed necessary and proper by the Court.

### JURY DEMAND

Plaintiff hereby requests a trial on all issues by jury per 42 U.S.C. § 1981a(c).

### CERTIFICATION

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Respectfully submitted,

12/27/18 _____ Date

_____ Signed

Marie Wohadlo, Plaintiff

PO Box 23
Thompsonville MI 49683